**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TERIELL SCOTT | Criminal Action No. 18-547<br><br>**SUPPLEMENTAL**<br>**MEMORANDUM OPINION**<br>**(Under Temporary Seal)** |

**SHIPP, District Judge**

This matter comes before the Court on the sentencing of Defendant Teriell Scott ("Scott"). On December 6, 2021, the Court held a hearing, where it sentenced Scott following his conviction on a one-count indictment charging him with unlawful possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). Before the sentencing, the U.S. Probation Office (the "Probation Office") issued its Final Presentence Report (the "Report" or "PSR") regarding Scott. Scott objected to the sentencing calculations in the Report, the Government opposed certain of Scott's objections, and Scott replied. The Court has carefully considered the parties' submissions and oral arguments and issues this Supplemental Memorandum Opinion adding to its findings and conclusions at the December 6, 2021 hearing.

## I.    BACKGROUND

The Court provides a brief background of the facts and procedural posture of this matter. Scott is a 34-year-old male from Asbury Park, New Jersey. (PSR 2 & ¶ 32.) He has two young children and lives with his mother. (*Id.* ¶¶ 56-57.) Scott has been diagnosed with bipolar disorder and an unspecified psychotic disorder but is not currently taking medication to treat either. (*Id.* ¶¶ 60-61.) As a young adult, Scott was also diagnosed with cannabis dependence and began attending a drug treatment program. (*Id.* ¶ 62.) He earned his GED sometime in 2010 and, as of

the date of the Report, works as a barber at a barbershop in Asbury Park. (*Id.* ¶¶ 66-67.) Before working as a barber, Scott "maintained odd jobs to support himself," including working as a heavy equipment operator for a waste management company, a full-time gas station attendant, and a golf course custodian. (*See id.* ¶¶ 68-73.)

As relevant here, Scott has two prior state law felony convictions that exceeded one-year terms of imprisonment. In 2009, Scott pled guilty to one count of aggravated assault, in violation of N.J. Stat. Ann. § 2C:12-1(b)(1), and was sentenced to a term of three years' incarceration. (*Id.* ¶ 38.) Later, in 2016, Scott pled guilty to one count of intent to distribute crack cocaine, in violation of N.J. Stat. Ann. § 2C:35-5(b)(3), and, in 2017, was sentenced to another term of three years' incarceration. (*Id.* ¶ 39.)

While under a supervisory program for the latter sentence, in September 2018, Scott was arrested for the instant offense. (*Id.* ¶ 6.) Specifically, officers arrested Scott for renting and firing two firearms at Shore Shot Pistol Range (the "Range") in Lakewood, New Jersey, in June 2018. (*Id.* ¶ 11.) Scott found himself at the Range because his then-girlfriend, Jackie Bekier ("Bekier"), purchased a discounted group ticket from a company called Groupon to go on a date to a shooting range with him.[1] Bekier testified that she purchased the Groupon voucher online at home, drove to the Range with Scott, and presented the Groupon voucher to the attendant at the Range. (Trial Tr. 235:1-13 (Bekier Direct).) At some point, Scott posted to his social media account pictures and videos, which showed him shooting at the Range. (PSR ¶ 16.) A detective for the Monmouth

---

[1] Notably, federal law does not require shooting ranges to conduct background checks on or keep records regarding their customers. *See* 18 U.S.C. § 922(b)(3) (exempting businesses that engage in "the loan or rental of a firearm to any person for temporary use for lawful sporting purposes" from laws governing gun sales and transfers); 27 C.F.R. § 478.97(b) ("[L]icensing and recordkeeping requirements contained in this part pertaining to firearms transactions would not apply to this temporary furnishing of firearms for use on premises [for skeet, trap, target, or similar shooting activity].").

County Prosecutor's Office, who monitored social media as part of his job duties, observed Scott's social media posts and alerted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of his findings. (Trial Tr. 25:19-27:4, 31:2-9 (Lao Direct).) Ultimately, ATF officers arrested Scott (while he was working) for violating 18 U.S.C. § 922(g)(1), which prohibits knowingly possessing a firearm with a previous felony conviction with a term of imprisonment greater than one year. (*See* PSR ¶ 1.)

The Court held a jury trial in October 2019, and a jury found Scott guilty of one count of unlawful possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). Before sentencing, the Probation Office calculated an advisory sentencing range of 92 to 115 months, based on a total offense level of 24 and Scott's criminal history category of V. (*See id.* ¶ 81.) In calculating Scott's offense level, the Probation Office applied a base-level sentencing enhancement under section 2K2.1(a)(2) of the U.S. Sentencing Guidelines Manual (the "Guidelines") for "sustaining at least two felony convictions of either a crime of violence or a controlled substance offense"—namely Scott's aggravated assault and intent-to-distribute convictions. (*See id.* ¶ 22.)

On April 12, 2021, Scott submitted correspondence objecting to various portions of the Probation Office's calculations. (*See generally* Def.'s Apr. 2021 Submission.) In that correspondence, Scott argues that his offense level should start at level 14 because neither his aggravated assault conviction nor intent-to-distribute conviction counts as a crime of violence or a controlled substance offense. *See* U.S. Sent'g Guidelines Manual § 2K2.1(a)(6) (U.S. Sent'g Comm'n 2021). According to Scott, the aggravated assault offense does not qualify as a crime of violence because New Jersey law requires extreme indifference recklessness, whereas comparable laws require a higher mens rea. (*See* Def.'s Apr. 2021 Submission 3-6.) In addition, Scott asserts that his intent-to-distribute offense does not qualify because New Jersey law prohibits Ioflupane

and positional isomers of cocaine, whereas the federal Controlled Substances Act (the "Act") and implementing federal regulations do not. (*See id.* at 11-12.) Although the bulk of Scott's correspondence concerns these issues, he also contends that he committed the instant offense while possessing firearms solely for a lawful sporting purpose, thereby meriting an offense-level decrease to six. (*See id.* at 12 (citing U.S. Sent'g Guidelines Manual § 2K2.1(b)(2).) Scott also requests a two-point reduction for acceptance of responsibility. (*See id.* at 12-13 (citing U.S. Sent'g Guidelines Manual § 3E1.1(a).)

On June 9, 2021, the Government opposed certain of Scott's objections to the Probation Office's calculations. (*See generally* Gov't's June 2021 Submission.) Relying on an earlier-filed brief, the Government contends that Scott's aggravated assault conviction is a crime of violence because it closely tracks the elements of a generic aggravated assault crime. (*See* Gov't's Nov. 2020 Submission 3-10.) Further, the Government counters that the plain text of the Guidelines allows predicate drug offenses to encompass federal and state convictions for any substance—not just substances defined federally. (*See* Gov't's June 2021 Submission 6-26.) The Government further argues that Scott is not entitled to a two-point reduction for acceptance of responsibility because he contested his guilt at trial. (*See* Gov't's Nov. 2020 Submission 10-11.) The Government did not respond to Scott's argument that he possessed the firearms solely for a lawful sporting purpose.[2]

---

[2] Following Scott's June 23, 2021 reply submission, the Government filed correspondence directing the Court to additional authorities for its position. (*See generally* Gov't's Nov. 2021 Correspondence.) The Court has considered those authorities in this Supplemental Memorandum Opinion.

## II.    LEGAL STANDARD

This Court has jurisdiction under 18 U.S.C. § 3231. *See United States v. Chapman*, 866 F.3d 129, 131 (3d Cir. 2017). District courts engage in a familiar three-step process when sentencing criminal defendants:

> A district court must begin the process by first calculating the applicable Guidelines range. After that initial calculation, the court must then rule on any motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation. Finally, after allowing the parties an opportunity for argument, the court must consider all of the § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines.

*United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (quoting *United States v. Levinson*, 543 F.3d 190, 194-95 (3d Cir. 2008)). As the parties' dispute largely centers on the proper Guidelines range under the first step of the sentencing analysis, the Court notes that "[t]he government bears the burden of establishing, by a preponderance of the evidence, prior convictions and career offender status." *United States v. Howard*, 599 F.3d 269, 271-72 (3d Cir. 2010) (citations omitted).

## III.    DISCUSSION

The Probation Office calculated a proposed sentence of 92 to 115 months for Scott. Scott presents three objections to that sentence. *First*, Scott argues that neither of his aggravated assault or intent-to-distribute convictions is a predicate offense under section 2K2.1(a)(2) of the Guidelines. *Second*, assuming the Court agrees with his first argument, Scott argues that he committed the instant offense with a lawful sporting purpose and that the Court should therefore reduce his offense level to six under section 2K2.1(b)(2) of the Guidelines. *Finally*, Scott proffers that the Probation Office failed to credit his acceptance of responsibility with a two-point reduction to his offense level under section 3E1.1(a) of the Guidelines.

The Court will consider each argument in turn but first provides a brief overview of the math behind the relevant Guidelines range for this case. Both the Probation Office and the

Government request that Scott start at offense level 24 based on a ten-point sentencing enhancement that purportedly applies because Scott has two prior predicate felony convictions. *See* U.S. Sent'g Guidelines Manual § 2K2.1(a)(2). Scott contests that those felony convictions do not qualify as predicate offenses and therefore argues that his offense level should start at level 14. *See* U.S. Sent'g Guidelines Manual § 2K2.1(a)(6). Next, Scott argues that he qualifies for an eight-point offense-level reduction because he committed the instant offense with a lawful sporting purpose. *See* U.S. Sent'g Guidelines Manual § 2K2.1(b)(2). Notably, in this case, that offense-level reduction applies only if the Court finds that Scott has no predicate offenses. *See id.* Now at offense level 6, Scott finally contends that he is entitled to a further two-point reduction for acceptance of responsibility. *See* U.S. Sent'g Guidelines Manual § 3E1.1(a). In sum, the Government asks for offense level 24, and Scott asks for offense level 4.

A.    **Scott's Prior Convictions Are Not Predicate Offenses Under Section 2K2.1(a)(2) of the Guidelines.**

1.    *Crime of Violence*

The Court first analyzes whether Scott's aggravated assault conviction is a predicate "crime of violence" under the Guidelines. The Court concludes that it is not.

To start, when analyzing predicate state crimes of violence, the Third Circuit employs the categorical approach. *See United States v. Graves*, 877 F.3d 494, 501 (3d Cir. 2017) (noting that district courts must compare "the elements of the 'generic' crime" with "the elements of the state offense"). Under that approach, the Court must ascertain the generic crime of violence for comparison. To that end, the Guidelines define the term "crime of violence" in two ways: (1) a crime that "has as an element the use, attempted use, or threatened use of physical force against the person of another" (the elements clause), or (2) a crime that is, among others, "aggravated assault" (the enumerated clause). U.S. Sent'g Guidelines Manual § 4B1.2(a). Notwithstanding the language of the enumerated clause, not every aggravated assault conviction qualifies as a predicate

crime of violence. Under that clause, "a court compares a state offense to the modern 'generic' view of the offense, 'roughly corresponding to the definitions of [those listed enumerated offenses] in a majority of the States' criminal codes,' 'regardless of technical definitions and labels under state law.'" *United States v. Randolph*, No. 18-380, 2019 WL 2067542, at *7 (D.N.J. May 10, 2019) (alteration in original) (quoting *Taylor v. United States*, 495 U.S. 575, 589 (1990)). Where the state offense criminalizes more conduct than the generic offense, the state offense does not qualify as a predicate crime of violence. *See id.* (citing *United States v. Matthews*, 453 F.3d 830, 833 n.7 (7th Cir. 2006)).[3]

Turning to the pertinent New Jersey statute, Scott pled guilty to one count under N.J. Stat. Ann. § 2C:12-1(b)(1):

> b. Aggravated assault. A person is guilty of aggravated assault if the person:
>
> > (1) Attempts to cause serious bodily injury to another, or causes injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury[.]

N.J. Stat. Ann. § 2C:12-1(b)(1). The parties focus the Court's attention on the mens rea requirement under the statute—specifically, "extreme indifference to the value of human life." *See id.* The relevant question therefore is whether a majority of states criminalizes aggravated assaults

---

[3] Before sentencing, the Government submitted correspondence clarifying that although it is "not asking the Court to . . . find for the United States under the elements clause in this case," it also is not "conced[ing] in this case that convictions under N.J.S.A. § 2C:12-1(b)(1) are not crimes of violence under the elements clause." (Gov't's Dec. 2021 Correspondence 2.) The Government further clarified that it maintains this position so as to "avoid any waiver of the argument in other proceedings or future proceedings in this matter." (*Id.*) The Court understands the Government's argument regarding the elements clause to depend on overruling controlling Third Circuit precedent. (*See id.* at 1-2 (citing *Popal v. Gonzales*, 416 F.3d 249, 254 (3d Cir. 2005); *United States v. Otero*, 502 F.3d 331, 335 (3d Cir. 2007)).) Because this Court lacks the authority to do so, it cabins its analysis to the enumerated clause.

with a mens rea higher than extreme indifference to the value of human life. If the majority so criminalizes, New Jersey's statute sweeps too broadly to qualify as a predicate crime of violence.

Luckily for the Court, the U.S. Court of Appeals for the Ninth Circuit has already conducted the necessary survey of state criminal codes. In *United States v. Garcia-Jimenez*, the Ninth Circuit concluded that "a substantial majority of U.S. jurisdictions require more than extreme indifference recklessness to commit aggravated assault." 807 F.3d 1079, 1085-86 (9th Cir. 2015) (finding that 33 states and the District of Columbia require more than extreme indifference recklessness). Critically, the Ninth Circuit conducted this survey against the defendant's prior conviction under N.J. Stat. Ann. § 2C:12-1(b)(1)—the same statute at issue here—and noted that it reviewed state statutes that "most closely mirror[]" New Jersey's aggravated assault provision. *Id.* at 1084 & 1085 n.5. Further, the Ninth Circuit's survey enjoys support from the U.S. Court of Appeals for the Fourth Circuit, which concluded that North Carolina's aggravated assault statute was "broader in scope than that punished by generic aggravated assault" and "fail[ed] the enumerated-offenses-clause test for a 'crime of violence.'" *See United States v. Simmons*, 917 F.3d 312, 318-21 (4th Cir. 2019) (citing *Garcia-Jimenez* favorably). Similarly, at least one court in this District has also relied on the Ninth Circuit's survey to hold that New Jersey's aggravated assault statute cannot constitute a predicate crime of violence. *See Randolph*, 2019 WL 2067542, at *7.

The Court thus adopts the Ninth Circuit's survey. As such, the Court concludes that New Jersey's aggravated assault statute is not a predicate crime of violence. The Third Circuit counsels that "the majority of state statutes defining the crime" is "the *most* important factor in defining the generic version of an offense." *Graves*, 877 F.3d at 504 (emphasis added). For that reason, the Court also rejects the Government's invitation to adopt the Model Penal Code's definition of a generic aggravated assault. *See id.* (reasoning that the Model Penal Code "does not supersede the

way in which the majority of states have defined that offense"). In support of its position, the Government offers a survey from the U.S. Court of Appeals for the Eighth Circuit, which analyzed whether aggravated assault statutes required a mens rea of ordinary recklessness. *See United States v. Schneider*, 905 F.3d 1088, 1094-95 (8th Cir. 2018). The Court finds, however, that the Ninth Circuit's survey is ultimately more germane to the dispute here. For example, the Government proffers that the Eighth Circuit analyzed a broader array of state statutes (such as first- and second-degree aggravated assault statutes) because it was determining whether ordinary recklessness was part of any generic aggravated assault. (*See* Gov't's Nov. 2020 Submission 5; *Schneider*, 905 F.3d at 1096-97 & nn.6-7.) The Ninth Circuit, in contrast, adhered its survey to statutes that most closely mirrored New Jersey's aggravated assault statute. *Garcia-Jimenez*, 807 F.3d at 1085 n.5. Indeed, because of the Eighth Circuit's survey's breadth, it ultimately did not answer the question that the Ninth Circuit did: whether a majority of states requires something more than extreme indifference recklessness.[4] Thus, as applied to this case, the Court does not find the Eighth Circuit's survey helpful to resolve what constitutes a generic aggravated assault.

### 2.    *Controlled Substance Offense*

The Court next analyzes whether Scott's intent-to-distribute offense is a predicate "controlled substance offense" under section 2K2.1(a)(2) of the Guidelines.

#### a.    The Modified Categorical Approach

The Court begins by determining which standard applies to its analysis. The Third Circuit has noted that the categorical approach generally applies to crimes that may qualify as controlled

---

[4] For the same reason, the Court does not find persuasive the Eighth Circuit's finding that only a plurality of states requires a mens rea of more than extreme indifference recklessness. *See Schneider*, 905 F.3d at 1096 & n.6. That survey's disparity with the Ninth Circuit's likely results from the different inputs used—which in turn result from the different questions answered by each court's survey.

substance offenses. *See United States v. Williams*, 898 F.3d 323, 333 (3d Cir. 2018) ("Ordinarily, to determine whether a prior conviction qualifies as a . . . controlled substance offense, we apply a categorical approach." (citing *Taylor*, 495 U.S. at 588)). But when prior crimes fall under statutes that are "divisible"—that is, "defined with alternative elements"—courts apply "a more record-invasive variant of the categorial approach," the modified categorical approach. *Id.* Here, the prior crime is intent to distribute crack cocaine in violation of N.J. Stat. Ann. § 2C:35-5. That statute, titled "Manufacturing, distributing or dispensing," lists fourteen subsections defining different ways in which criminal suspects may manufacture, distribute, or dispense controlled dangerous substances. *See* N.J. Stat. Ann. § 2C:35-5(b)(1)-(14). The subsections include different types of substances and different types of penalties, including varying fines and degrees of offenses. *Id.*; *see also Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (noting that divisible statutes "may list elements in the alternative, and thereby define multiple crimes"). Thus, the Court has little trouble concluding that N.J. Stat. Ann. § 2C:35-5 is a divisible statute and that the modified categorical approach applies.[5]

Applying that approach, the Court may look to the charging document, the plea agreement, the plea hearing transcript, and comparable judicial records. *See Shepard v. United States*, 544 U.S. 13, 26 (2005). Following that review, the Court resorts to the categorical approach, whereby it "compare[s] the elements of the prior offense with the criteria that the Guidelines use to define a 'controlled substance offense.'" *United States v. Ward*, 972 F.3d 364, 368 (4th Cir. 2020) (citing

---

[5] Multiple courts in this Circuit have reached the same conclusion. *See, e.g.*, *Lepianka v. Att'y Gen.*, 586 F. App'x 869, 871 (3d Cir. 2014) (per curiam) ("However, because [N.J. Stat. Ann. § 2C:35-5] covers 'distinct offenses carrying separate penalties,' . . . [courts] may turn to the modified categorical approach." (citation omitted)); *United States v. Lewis*, No 20-583, 2021 WL 3508810, at *3 (D.N.J. Aug. 10, 2021) ("N.J.S.A. § 2C:35-5 is divisible and, therefore, the modified categorical approach applies . . . ."); *Mass v. United States*, No. 11-2407, 2014 WL 6611498, at *7 (D.N.J. Nov. 20, 2014) (same).

*Shular v. United States*, 140 S. Ct. 779, 783 (2020)).[6] Here, Scott submitted his Judgment of Conviction, which confirms that he pled guilty under N.J. Stat. Ann. § 2C:35-5(b)(3). (*See* Def.'s Apr. 2021 Submission Ex. A.) That subsection prohibits manufacturing, distributing or dispensing, or possessing with intent to distribute less than one-half ounce of several controlled substances. *See* N.J. Stat. Ann. § 2C:35-5(b)(1), (3). Turning to the criterion in the Guidelines, the Guidelines define "controlled substance offense" as follows:

> [A]n offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S. Sent'g Guidelines Manual § 4B1.2(b). The Guidelines do not define the term "controlled substance." Thus, an interpretive problem arises: Under the Guidelines, which substances qualify for controlled substance offenses?

At bottom, the answer lies in statutory (or in this case, Guidelines) interpretation. Unsurprisingly, the parties offer up competing interpretations. The Government urges the Court to accept the ordinary meaning of the term "controlled substance," which it claims is any substance regulated by federal or state law. (*E.g.*, Gov't's June 2021 Submission 7.) Scott counters that "controlled substance" takes on the definition under federal law, referring to substances listed on

---

[6] The parties appear to agree that this second approach under *Shular* applies. (*See* Def.'s Apr. 2021 Submission 9 (noting that "second categorical methodology" in *Shular* "applies to determining whether a state offense is a 'serious drug offense' under the Armed Career Criminal Act").) The Court assumes, without finding, that this approach—asking "whether the conviction meets some other criterion" (here, the criterion set forth in the Guidelines)—applies. *See Shular*, 140 S. Ct. at 783. The Court notes, however, that its conclusions would not differ under either approach because both approaches rely on a controlling definition of "controlled substance" in the Guidelines. *See United States v. Glass*, 904 F.3d 319, 321 (3d Cir. 2018) ("A state conviction cannot qualify as a 'controlled substance offense' if its elements are broader than those listed in § 4B1.2(b)." (citing *Mathis*, 136 S. Ct. at 2251)).

the federal drug schedules. (Def.'s Apr. 2021 Submission 10; *see* 21 U.S.C. § 802(6) ("The term 'controlled substance' means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter.").) In support of their competing constructions, both parties advance different sides of a circuit split on this issue. By the Court's count, five circuits support the Government's position. *E.g.*, *Ward*, 972 F.3d at 368-71; *United States v. Ruth*, 966 F.3d 642, 651-52 (7th Cir. 2020); *United States v. Henderson*, 11 F.4th 713, 717-19 (8th Cir. 2021); *United States v. Jones*, 15 F.4th 1288, 1291-96 (10th Cir. 2021); *United States v. Pridgeon*, 853 F.3d 1192, 1197-98 (11th Cir. 2017). Three support Scott's position. *E.g.*, *United States v. Townsend*, 897 F.3d 66, 70-71 (2d Cir. 2018); *United States v. Gomez-Alvarez*, 781 F.3d 787, 793 (5th Cir. 2015); *United States v. Bautista*, 989 F.3d 698, 702 (9th Cir. 2021). The U.S. Court of Appeals for the Sixth Circuit has an intra-circuit split. *See United States v. Williams*, 850 F. App'x 393, 396-97 (6th Cir. 2021) (listing cases). The remainder, including the Third Circuit,[7] have not expressly addressed the question.

> b.    The Ordinary Meaning of "Controlled Substance"

With these conflicting authorities in mind, the Court must begin its analysis with "the language of the statute itself." *In re Denby-Peterson*, 941 F.3d 115, 124 (3d Cir. 2019) (quoting *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011)). Several canons guide the Court's analysis of statutory language. *See United States v. Johnson*, 155 F.3d 682, 683 (3d Cir. 1998) ("The Sentencing Guidelines are read according to the canons of statutory interpretation" (citing *United States v. Wong*, 3 F.3d 667, 670-71 (3d Cir. 1993))). For one, the Court determines whether

---

[7] The Court notes, however, that a district split exists within the Third Circuit, with three cases supporting Scott's position and one supporting the Government's position. *Compare Lewis*, 2021 WL 3508810, at *8-10, *and United States v. Jamison*, 502 F. Supp. 3d 923, 928-30 (M.D. Pa. 2020), *and United States v. Miller*, 480 F. Supp. 3d 614, 619-21 (M.D. Pa. 2020), *with* Sentencing Tr. 28:6-31:19, *United States v. Paredes*, No. 19-232 (D.N.J. Aug. 19, 2021), ECF No. 156.

12

the statutory language is ambiguous by examining "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) (quoting *Marshak v. Treadwell*, 240 F.3d 184, 192-93 (3d Cir. 2001)); *see also United States v. Wong*, 3 F.3d 667 (3d Cir. 1993) ("[T]he plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation."). Additionally, the Court must presume that "every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (citing *Rosenberg*, 274 F.3d at 141-42). Finally, the Court considers the "overall 'object and policy' of the statute" and "avoid[s] constructions that produce 'odd' or 'absurd results' or that are 'inconsistent with common sense.'" *Id.* (first quoting *United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994); then quoting *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989)).

Turning to the relevant language, the Court concludes that the term "controlled substance" does not have an ordinary meaning that unambiguously answers which substances qualify for controlled substance offenses. District courts read statutory language "in its ordinary and natural sense" because "it is presumed that Congress expresses its intent through the ordinary meaning of its language." *Bd. of Trs. of IBT Loc. 863 Pension Fund v. C&S Wholesale Grocers Inc./Woodbridge Logistics, LLC*, 5 F. Supp. 3d 707, 717 (D.N.J. 2014) (first quoting *Harvard Secured Creditors Liquidation Tr. v. I.R.S.*, 568 F.3d 444, 451 (3d Cir. 2009); then quoting *Register v. PNC Fin. Servs. Grp., Inc.*, 477 F.3d 56, 67 (3d Cir. 2007)). But, as Fourth Circuit Chief Judge Roger L. Gregory notes, the term "controlled" is a passive past participle that naturally raises the question of who controls the substance. *See Ward*, 972 F.3d at 379 (Gregory, C.J., concurring in judgment). Similarly, the dictionary definition of "controlled substance" does not help answer the question of which law controls. In ascertaining ordinary meaning, courts often

13

turn to dictionary definitions. *See United States v. McClure-Potts*, 908 F.3d 30, 36 (3d Cir. 2018). Black's Law Dictionary defines the term "controlled substance" as "[a] drug that is *illegal to possess or use without a doctor's prescription*" and specifically "any type of drug whose manufacture, possession, and use is *regulated by law*." Black's Law Dictionary (11th ed. 2019) (emphases added). The dictionary definition simply begs the question.

Further obscuring the ordinary meaning of "controlled substance," the U.S. Supreme Court has noted that "[c]ontrol is a term of art in the CSA." *Gonzales v. Oregon*, 546 U.S. 243, 259-60 (2006) (quoting 21 U.S.C. § 802(5)). Thus, ordinary-meaning analysis may be improper because that analysis generally applies only to nontechnical terms. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (citations omitted)); *Smith v. United States*, 508 U.S. 223, 242 (1993) (Scalia, J., dissenting) ("In the search for statutory meaning, we give nontechnical words and phrases their ordinary meaning." (citations omitted)). Indeed, to the extent "controlled substance" is a technical term of art in the Guidelines, it appears to mean a substance controlled by the federal government. The Act defines "control" to mean "to add a drug or other substance, or immediate precursor, to a schedule under part B of this subchapter, whether by transfer from another schedule or otherwise"—in other words, a substance listed in the federal drug schedules. 21 U.S.C. § 802(5).

Nevertheless, the Government argues that the Guidelines's use of the modifier "under federal or state law" compels the conclusion that the ordinary meaning of "controlled substance" includes substances regulated by state law. The Court disagrees. The modifier does not help define the term "controlled substance" but rather "offense": "The term 'controlled substance offense' means an offense under federal or state law . . . that prohibits . . . the possession of a controlled substance . . . with intent to . . . distribute." U.S. Sent'g Guidelines Manual § 4B1.2(b). Under the

14

nearest reasonable referent rule, "modifiers attach to the closest noun" and "courts should not interpret statutes in such a way as to 'divorce a noun from the modifier next to it without some extraordinary reason.'" *United States v. Jackson*, 964 F.3d 197, 202 & n.7 (3d Cir. 2020) (quoting *United States v. Wirsing*, 943 F.3d 175, 185 (4th Cir. 2019)). Said another way, the text does not instruct courts to look to federal- and state-law *controlled substances*; it instead commands courts to look to federal- and state-law *offenses. See Lewis*, 2021 WL 3508810, at *8 ("[I]f 'controlled substance offense' were intended to include offenses involving substances that are controlled under both federal and state law, the definition should read 'a controlled substance *under federal or state law.*'" (internal quotation marks, alteration, and citation omitted)). Thus, the Government's counterargument does not answer the question before the Court as to which controlled substances count for predicate federal- and state-law offenses.

The Court is also troubled by the Government's ordinary-meaning construction of "controlled substance" because that construction leads to surplusage in the Guidelines. *See Silverman v. Eastrich Multiple Inv. Fund, L.P.*, 51 F.3d 28, 31 (3d Cir. 1995) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (citation omitted)). Applying the Government's meaning of "controlled substance" renders the modifier "under federal or state law" superfluous. An example shows how. The Government asks the Court to impose this construction: "The term 'controlled substance offense' means an offense under federal or state law that prohibits the possession of a federal or state substance with intent to distribute." But if that construction held, the Sentencing Commission would not have needed to modify the term "offense" to apply to federal and state law. In fact, under the Government's construction, the Guidelines would read the same without the modifier: "The term 'controlled substance offense' means an offense that prohibits the possession of a federal or state substance with intent to distribute." *But see United*

*States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988))). Conversely, Scott's construction gives effect to every word: "The term 'controlled substance offense' means an offense under federal or state law that prohibits the possession of a federal substance with intent to distribute." *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013))).

c.    The Context of "Controlled Substance"

Continuing its search for meaning, the Court turns to the context of the term "controlled substance" in section 4B1.2 and the term's broader context in the Guidelines. Here, the Court concludes that the context in which the Sentencing Commission used the term "controlled substance" confirms that the term unambiguously refers to substances regulated by federal law. Start with the commentary to section 4B1.2 of the Guidelines. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").[8] Application Note 1 of the commentary lists four examples of "controlled substance offenses," each expressly and parenthetically referring to

---

[8] Although the Court is not deciding whether it defers to the Sentencing Commission's commentary as controlling, the Court notes that the Sentencing Commission's interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Further, neither party asserts that this commentary is unreasonable, outside the Sentencing Commission's "substantive expertise" and "fair and considered judgment," or plainly inconsistent with the text of the Guidelines. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-18 (2019); *see also United States v. Nasir*, 17 F.4th 459, 470-72 (3d Cir. 2021).

specific provisions of the Act. *See* U.S. Sent'g Guidelines Manual § 4B1.2 cmt. n.1. The explicit

cross references to the Act—without any similar reference to state laws—furnish some evidence

that the Sentencing Commission intended to define "controlled substance" to refer to the Act. *See*

*Ward*, 972 F.3d at 383 (Gregory, C.J., concurring in judgment) ("If the Sentencing Commission

sought to include all prohibited substances under state law as qualifying controlled substances, one

would expect the related commentary to be more inclusive."). Notably as well, the Sentencing

Commission added these examples in 1997 in response to a circuit split over the definition of

"controlled substance offenses," whereby some courts found federally listed chemicals to not

qualify as federal controlled substances. *See United States v. Smith*, 433 F.3d 714, 716-17 (10th

Cir. 2006). Yet, instead of seizing the opportunity to clarify that substances controlled by states

were "controlled substances," the Sentencing Commission chose to illustrate "controlled substance

offenses" by exclusive reference to federal law.[9]

Further, the context of the term "controlled substance" elsewhere in the Guidelines bestows

the term with a distinctly federal sheen. For example, in section 2D1.1, the Sentencing

Commission created a "drug quantity table" that lists "controlled substances." U.S. Sent'g

Guidelines Manual § 2D1.1(c). Application Note 8 of the commentary to that section provides

that, in creating the tables, the Sentencing Commission "used the sentences provided in, and

equivalencies derived from, the statute (21 U.S.C. § 841(b)(1)) [the Act], as the primary basis for

the guideline sentences." U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.8(A). Application Note

---

[9] The Government parries that the 1989 amendment to the Guidelines is instructive. (*See* Gov't's June 2021 Submission 13-14 & nn.3-4.) According to the Government, that amendment deleted cross references to the Act from section 4B1.2(2) of the Guidelines (the predecessor to section 4B1.2(b)). (*Id.*; *see also Jones*, 15 F.4th at 1295.) The Court, however, does not find this amendment persuasive authority particularly because the later-in-time commentary added back in cross references to federal law in the Guidelines's application notes and because the amendment does not add in express cross references to state law.

6 likewise describes the term "analogue" as having the same meaning as "controlled substance analogue" in 21 U.S.C. § 802(32) of the Act. U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.6.

The Court recognizes that the Government and other courts rely on these same provisions to conclude that the Sentencing Commission's lack of express reference to the definition of "controlled substance" in the Act evinces the Sentencing Commission's intent to include substances regulated by states. *See, e.g.*, *Ruth*, 966 F.3d at 651-52. An omission of one thing, however, does not necessarily mean the presence of another. So too here: the Court does not find that the exclusion of an express reference to federal law constitutes an implied inclusion of state law. *Cf. Shular*, 140 S. Ct. at 786 ("Congress' decision to identify federal offenses by reference to the U.S. Code does not speak to whether it identified state offenses by reference to named offenses or conduct."). That is especially so because, to the Court's knowledge, the Guidelines do not expressly reference state-law definitions of controlled substances anywhere. Even stronger, the Court believes that defining "controlled substance" as including state-law substances defies the context in which the Guidelines uses that term and introduces ambiguity into the Guidelines. Take, for example, the definition of "controlled substance analogue," which the Sentencing Commission has expressly adopted from the Act. *See* 21 U.S.C. § 802(32) (defining "controlled substance analogue" as one that is "substantially similar" to "a controlled substance in schedule I or II" but not "a controlled substance"). Under the Government's approach, for sentencing, courts would define a "controlled substance" by reference to federal and state law but "controlled substance analogue" by reference to federal law only. The better-reasoned and common-sense approach is to follow the context of the Guidelines: the term "controlled substance" in the Guidelines has the same meaning as used by federal law.

Additionally, reviewing the broader context of the Guidelines, the Court is mindful of the Sentencing Commission's policy statements. Of note, the Sentencing Commission stated that

"Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S. Sent'g Guidelines Manual, ch. 1, pt. A, introductory cmt. 1(3). The Court achieves that goal by adopting Scott's construction, which places all federal defendants under a singular and easy-to-apply definition of "controlled substance" (*i.e.*, substances defined federally). An example shows how adopting the Government's approach leads to state-dependent sentencing outcomes. Suppose one criminal defendant had two prior state drug convictions in State A for a drug criminalized in State A but not by federal law. Suppose further that another criminal defendant committed the same drug-related conduct in neighboring State B, but that conduct never resulted in convictions because State B does not criminalize that drug. Under the Government's approach, each defendant's sentence depends on which side of the border each defendant committed the conduct. Specifically, the first defendant would be a career offender by misfortune of committing the crimes in State A; the second defendant would not be eligible for the career-offender sentencing enhancement at all. *But see Ward*, 972 F.3d at 381 (Gregory, C.J., concurring in judgment) ("[T]he federal Guidelines do not want courts to treat someone from Virginia more favorably than someone from West Virginia simply because they were lucky enough to commit the conduct on the right side of the border."). Under Scott's approach, however, the defendant would not qualify as a career offender in either state because Congress chose not to criminalize that drug. *See Taylor*, 495 U.S. at 591 (requiring "clear indication" that "Congress intended to abandon its general approach of using uniform categorical definitions to identify predicate offenses").[10]

---

[10] That is not to say that prior state convictions are irrelevant to a sentencing analysis. The Court retains substantial discretion, for example, to grant upward variances under 18 U.S.C. § 3553(a)(2)(B) (affording adequate deterrence to criminal conduct) and 18 U.S.C. § 3553(a)(2)(C) (protecting the public from further crimes). *See, e.g.*, Sentencing Tr. 31:20-32:8, *Paredes*, No. 19-232 (describing upward variance based on criminal history because of deterrence and need to protect the public).

Finally, to the extent any ambiguity with the context of "controlled substance" remains, the Court concludes that such ambiguity is overcome by the *Jerome* presumption. The presumption provides that "when Congress adopts a federal statutory scheme . . . [,] it normally intends that (the scheme) shall operate uniformly throughout the nation." *Laird v. Interstate Com. Comm'n*, 691 F.2d 147, 153 (3d Cir. 1982) (internal quotation marks omitted) (ultimately citing *Jerome v. United States*, 318 U.S. 101, 104 (1943)). Critically, the Third Circuit has counseled that "when that federal statutory scheme does not indicate which law is to be applied in carrying out its commands (and when reliance on state law could jeopardize the desired uniformity of operation) courts have adopted a federal rule for consistent application." *Id.* (citation omitted). That is precisely what is appropriate here, particularly in the messy field of sentencing where avoiding disparities is a paramount concern.[11] *See Townsend*, 897 F.3d at 71 ("[F]ederal law is the interpretive anchor to resolve the ambiguity at issue here. Any other outcome would allow the Guidelines enhancement to turn on whatever substance 'is illegal under the particular law of the State where the defendant was convicted,' a clear departure from *Jerome* and its progeny." (citation omitted)); *Bautista*, 989 F.3d at 702 ("[C]onstruing the phrase in the Guidelines to refer to the definition of 'controlled substance' in the CSA—rather than to the varying definitions of "controlled substance" in the different states—furthers uniform application of federal sentencing

---

[11] The Court further notes that adoption of a definition of "controlled substance" under a single federal law renders the 18 U.S.C. § 3553(a)(6) analysis (avoiding sentencing disparities among federal defendants) fairer because district courts will likely have an easier time identifying similarly situated defendants (as opposed to defendants with similar state-specific prior convictions).

law, thus serving the stated goals of both the Guidelines and the categorical approach." (citing *United States v. Leal-Vega*, 680 F.3d 1160, 1166 (9th Cir. 2012))).[12]

d.    Categorical Comparison

Having determined that "controlled substance" as used in the Guidelines means "controlled substance" as defined by federal law, the Court compares the Guidelines with the New Jersey statute under which Scott was convicted. The Guidelines define controlled substance offenses as including intending to distribute controlled substances. As relevant here, the Act includes as controlled substances "cocaine, its salts, optical and geometric isomers, and salts of isomers." 21 U.S.C. § 812(c) (Schedule II). Pertinent federal regulations exclude from that definition certain cocaine derivatives, including "[d]ecocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine" and "[[123] I]Ioflupane." 21 C.F.R. § 1308.12(b)(4) (2021); *see also Schedules of Controlled Substances: Removal of [[123] I]Ioflupane From Schedule II of the Controlled Substances Act*, 80 Fed. Reg. 54715, 54715 (Sept. 11, 2015) (removing Ioflupane from schedules of the Act). Scott was convicted under N.J. Stat. Ann. § 2C:35-5, which prohibits manufacturing, distributing or dispensing, or possessing with intent to distribute less than one-half ounce of several controlled substances, including crack cocaine. *See* N.J. Stat. Ann. § 2C:35-5(b)(1), (3). Unlike the federal definition, however, New Jersey law does not exclude Ioflupane from New Jersey drug schedules. *See* N.J. Stat. Ann. § 24:21-6(c)-(d) (2008); *State v. Cathcart*, 589 A.2d 193, 197 (N.J. Super. Ct. App. Div. 1991) ("[A]ll forms of cocaine are prohibited by statute."); *Martinez v. Att'y Gen.*, 906 F.3d 281, 287 (3d Cir. 2018) ("To be sure, the New Jersey statute criminalizes *any* derivative of coca leaves. And federal law *currently* exempts

---

[12] Although the Court does not find the text of the Guidelines to be ambiguous, the Court notes that any ambiguity should be resolved in favor of Scott. *See United States v. Santos*, 553 U.S. 507, 514 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." (citations omitted)).

21

[[123] I]Ioflupane, a derivative of coca leaves, from the lists." (citations omitted)). Thus, the New Jersey statute sweeps broader than what the Guidelines contemplate as a controlled substance offense, and Scott's state conviction does not qualify as a predicate offense under section 2K2.1(a)(2) of the Guidelines.

The Court recognizes that its decision leads to the outcome that prior felony convictions involving crack cocaine in New Jersey cannot qualify as predicate controlled substance offenses. In particular, the Government warns that Scott's approach requires courts to engage in potential atomic-level comparisons of drug isomers. (*See* Gov't's June 2021 Submission 4-5.) The Court finds, however, that such comparison is what the categorical approach countenances. *See Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013) ("Because we examine what the state conviction necessarily involved, not the facts underlying the case, we must presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized, and then determine whether even those acts are encompassed by the generic federal offense." (alterations in original) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010))). The Court further notes that adopting the Government's approach guts the categorical approach. By incorporating substances outlawed by the state of conviction into the federal Guidelines, no meaningful categorical analysis occurs because virtually any prior state drug conviction will, by the Government's definition, be a controlled substance offense. Said another way, the Government asks the Court to find that the federal definition of a controlled substance always includes what fifty state legislatures chose to outlaw. *But see Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1570 (2017) ("[T]he Government's definition turns the categorical approach on its head by defining the generic federal offense of sexual abuse of a minor as whatever is illegal under the particular law of the State where the defendant was convicted."). The Court declines to conclude

that the Sentencing Commission envisioned that odd result and reasons that any issues regarding the propriety of the categorical approach are best left for the appellate courts to consider.

**B.      Scott Committed the Instant Offense With a Lawful Sporting Purpose Under Section 2K2.1(b)(2) of the Guidelines.**

Because the Court concludes that Scott does not have predicate offenses, it next considers whether the Guidelines entitle Scott to an offense-level decrease to a level six because he possessed the rented guns solely for a lawful sporting purpose. *See* U.S. Sent'g Guidelines Manual § 2K2.1(b)(2). Scott advances that target shooting at a gun range is a lawful sporting purpose, and the Government's papers do not address the reduction. (*See* Def.'s Apr. 2021 Submission 12.) Critical here, the burden is on Scott to show by a preponderance of the evidence that "his possession was for lawful sporting purposes" and that "his discharge or use was lawful." *United States v. Hauck*, 532 F. App'x 247, 250 (3d Cir. 2013) (citing *United States v. Miller*, 224 F.3d 247, 251 (3d Cir. 2000)). Because no dispute exists as to whether Scott's possession or use of the rented guns at the Range was lawful,[13] the Court focuses on the first requirement.

Under the Guidelines, Scott must have "possessed all ammunition and firearms solely for lawful sporting purposes or collection." U.S. Sent'g Guidelines Manual § 2K2.1(b)(2). Two elements are relevant here: whether shooting at the Range is a "sporting purpose" and whether, considering all the facts of this case, possessing rented guns at the Range was "solely" a sporting purpose. Turning to the first element, the Court concludes that shooting rented guns at a gun range qualifies as a sporting purpose. The Court finds instructive the Third Circuit's analysis in *United*

---

[13] To be sure, the lawfulness inquiry turns on whether Scott lawfully possessed and used firearms regardless of whether he was convicted on a felon-in-possession charge. *See United States v. Shell*, 972 F.2d 548, 552 (5th Cir. 1992) ("[T]he reduction provisions of the guidelines for felons in possession do not turn on the axiomatic truism that a felon can never lawfully possess a firearm."); *Hauck*, 532 F. App'x at 250-51 (analyzing whether a defendant convicted on felon-in-possession charge unlawfully used firearm when firing that firearm at public highway, in violation of Pennsylvania law). Here, the parties do not dispute that shooting rented guns at the Range was a lawful possession and use of firearms.

*States v. Bossinger*, 12 F.3d 28 (3d Cir. 1993). There, the Third Circuit analyzed the lawful-sporting-purpose requirement and determined that "[a] firearm possessed 'solely for lawful sporting purposes' is . . . understood to mean a firearm possessed solely for lawful recreational use" and that "nothing in the text or legislative history of [section 2K2.1(b)(2) of the Guidelines] . . . justif[ied] a more restrictive reading." *Bossinger*, 12 F.3d at 29-30. Notably, the Third Circuit rejected an argument that a sporting purpose must be competitive: "We are unable to perceive any reason the Sentencing Commission might have distinguished for sentencing purposes between competitive target shooters and someone deriving pleasure from testing his or her ability to hit a 'bull's eye' target . . . ." *Id.* at 30. Applying that reasoning, the Third Circuit held that plinking, shooting at cans and bottles outdoors, was a sport. *Id.* Even stronger then is the case here, where Scott and Bekier visited the Range to engage in target shooting following Bekier's purchase of the Groupon voucher. Indeed, just as the Third Circuit has noted, "deriving pleasure from testing [one's] ability to hit a bull's eye target" qualifies as a sporting purpose. *Id.* at 30.[14]

Further furnishing evidence that shooting targets at a gun range qualifies as a sporting purpose, the relevant federal laws exempt gun ranges from onerous regulations. For example, the Gun Control Act exempts from certain regulations businesses that engage in "the loan or rental of a firearm to any person for temporary use for *lawful sporting purposes*." 18 U.S.C. § 922(b)(3) (emphasis added). Similarly, implementing regulations from ATF exempt organizations that "temporarily furnish[] firearms (whether by loan, rental, or otherwise) to participants in a skeet, trap, target, or similar shooting activity" from certain recordkeeping and licensing requirements. 27 C.F.R. § 478.97(b).

---

[14] Trial testimony also bears out the inference that the Range advertised target shooting as a recreational activity. (*See* Trial Tr. 120:7-15 (Eldershaw Cross) (testifying that the Range markets for "bachelorette parties," "birthday parties," and "ladies' nights")).

Having determined that Scott has shown by a preponderance of the evidence that he engaged in a lawful sporting purpose, the Court must ascertain whether Scott had any other non-sporting purpose. If he did, the Court cannot grant the offense-level reduction under the Guidelines. *See* U.S. Sent'g Guidelines Manual § 2K2.1(b)(2). At the onset, the Court notes that the Third Circuit has not squarely addressed the question of what constitutes a sole sporting purpose. *See Bossinger*, 12 F.3d at 30 (remanding to decide whether the defendant "possessed the firearms solely for lawful plinking"). The Court is confident, however, that Scott had solely a sporting purpose here. No evidence exists showing that Scott and Bekier went to the Range to engage in anything but target shooting. Indeed, that's exactly what the Range advertised through its Groupon advertisement. (*See* Trial Tr. 54:2-13 (Eldershaw Direct) (noting that the Range advertises through Groupon, whose vouchers cover "the rental of a firearm, the use of the firing range, and . . . some targets").) Further, social media posts on the Range's Instagram account suggest that patrons visit the Range to engage in shooting at targets. (*See* Def.'s Apr. 2021 Submission Ex. B (showing Instagram posts of Range customers shooting at targets, discussing "groupings," and hashtagging "bull's eyes").) Simply put, on the facts of this case, the Court finds that Scott has shown a sole sporting purpose based on the preponderance of the evidence.

As set forth above, the Government did not brief whether Scott is entitled to the lawful-sporting-purpose reduction. In fact, at the December 6, 2021 hearing, the Government conceded that the reduction applies. To the extent that Scott's own social media posts constitute a non-sporting purpose, the Court rejects that contention. Scott's social media posts show Scott "facing downrange" and "firing the Revolver and the Rifle at the Range." (PSR ¶ 16.) In other words, Scott's Instagram posts show that he was engaged in shooting at targets—a sporting purpose. Similarly, Scott's Instagram post showing inartful rap lyrics that mention "a head shot" is not indicative of a non-sporting purpose. (*Id.*) The post does not threaten or target any specific

individual, and the Court does not find that a single rap lyric morphs a sporting purpose into a non-sporting one. Social media and inartful posts are part of everyday life. Indeed, the Range itself encourages its patrons to post to social media, and trial testimony noted that patrons commonly posted photos and videos to social media. (*See* Trial Tr. 139:24-141:2 (Eldershaw Cross).) Were the Court to find that posting to social media shows a non-sporting purpose, it fears that such finding would swallow up the entire lawful-sporting-purpose base-level reduction. *See United States v. Shell*, 972 F.2d 548, 551 (5th Cir. 1992) (rejecting construction of section 2K2.1(b)(2) of the Guidelines that "would swallow the reduction guideline itself").

The Court recognizes that some contrary (albeit, non-precedential) authority exists. *See United States v. Alexander*, 827 F. App'x 1011, 1012 (11th Cir. 2020) (non-precedential) (affirming district court's finding that the defendant's social media postings "support a finding that he had an additional purpose"), *cert. denied*, 141 S. Ct. 2676 (U.S. May 24, 2021); *United States v. Palmer*, No. 19-514, 2020 WL 1812930, at *4 (D. Md. Apr. 9, 2020) (finding non-sporting purpose where the defendant livestreamed Instagram video showing him "pointing the firearm at the screen" and "mock shooting"). But the Court is not persuaded by these out-of-circuit cases. For one, *Alexander* summarily affirmed the district court's finding on clear-error review and did not engage in a rigorous analysis of section 2K2.1(b)(2) of the Guidelines.[15] In addition, *Palmer* is distinguishable on the facts. There, the social media video showed the defendant pointing a rented gun directly at a livestreaming camera and pretending to fire. *See Palmer*, 2020 WL 1812930, at *4 (characterizing social media video as "broadcast[ing] conduct clearly prohibited by federal criminal law"). Unlike the social media video in *Palmer*, here, Scott's social media

---

[15] The Court notes that its review of the case law reveals that several courts find non-sporting purposes when evidence exists that defendants possessed guns for self-defense purposes. *See, e.g.*, Elizabeth Williams, Annotation, *Construction and Effect of United States Sentencing Guidelines § 2K2.1 (U.S.S.G. § 2K2.1, 18 U.S.C.)*, 2002 A.L.R. Fed. 9 § 5[c] (2002).

posts show nothing but shooting at targets—compliant with Range policy and, as far as the Court is aware, federal law. The Court thus finds *Palmer* distinguishable and does not apply its reasoning here.[16]

The Court holds that, on the facts of this case, Scott has shown by a preponderance of the evidence that he is entitled to an offense-level reduction to a level six under section 2K.1(b)(2) of the Guidelines.

### C.    Scott Is Not Entitled to a Two-Point Reduction for Acceptance of Responsibility Under Section 3E1.1(a) of the Guidelines.

Scott also argues that he should receive a two-level reduction for acceptance of responsibility. (*See* Def.'s Apr. 2021 Submission 12-13.) The Government opposes Scott's objection, arguing that Scott denied responsibility for his criminal conduct pre-trial and through to the guilty verdict. (*See* Gov't's Nov. 2020 Submission 10-11.) Under the Guidelines, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S. Sent'g Guidelines Manual § 3E1.1(a). Application Note 2 of that section provides that

> [c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

U.S. Sent'g Guidelines Manual § 3E1.1 cmt. n.2. Critically, however, "[t]he question is not whether [a] defendant actively asserted his innocence, but whether he clearly demonstrated

---

[16] The Court is further troubled by the *Palmer* Court's characterization of the defendant as "celebrat[ing] . . . gun culture online." 2020 WL 1812930, at *4.

acceptance of his guilt." *United States v. Griffith*, 928 F.3d 855, 875 (10th Cir. 2019) (citation omitted).

Applying the standard here, Scott put the Government to its proofs at trial and denied responsibility for his crime. Indeed, the trial transcript is replete with references of that denial. (*See, e.g.*, Trial Tr. 20:4-6 ("As the gatekeeper for justice, you'll see at the end of the case that no crime occurred."); Trial Tr. 305:17-20 ("You have to decide whether or not the government has proven all the elements, all the four elements of this offense, beyond a reasonable doubt. And I tell you they didn't, and they can't."); Trial Tr. 311:15-16 (arguing that during Scott and Bekier's visit to the Range, "they were playing the [G]overnment's game of 'gotcha'"); Trial Tr. 312:9-11 ("I'm asking for a verdict that ratifies the presumption of innocence and recognizes what the government has failed to prove.").) The Court thus finds that this is not one of the rare instances where a reduction for acceptance of responsibility is warranted.

## IV.    CONCLUSION

The Court holds that Scott's base offense level is six. In so holding, it concludes that the base-level sentencing enhancement under section 2K2.1(a)(2) does not apply because neither of Scott's prior felony convictions qualifies as a predicate offense. The Court further concludes that Scott committed the instant offense with a lawful sporting purpose and that Scott is not entitled to a two-point reduction for acceptance of responsibility.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE